622 So.2d 760 (1993)
MONROE MEDICAL CLINIC, INC., Plaintiff-Appellant,
v.
HOSPITAL CORPORATION OF AMERICA, et al., Defendants-Appellants.
No. 24426-CA.
Court of Appeal of Louisiana, Second Circuit.
July 21, 1993.
*762 M.F. "Rick" Fayard, Jr., Fred R. McGaha, Boissier City, for Monroe Medical Clinic plaintiff-appellant.
McLeod, Verlander, Eade and Verlander by David E. Verlander, III, Robert P. McLeod and Paul J. Verlander, Monroe, for HCA, et al. defendants-appellants.
*763 K. Gregory Tucker, Nashville, TN, for HCA, defendant-appellant.
Before MARVIN, LINDSAY and WILLIAMS, JJ.
MARVIN, Chief Judge.
In this action under the Unfair Trade Practices Law, the defendants, Arlen Reynolds, the former hospital administrator, and two corporations that controlled and operated the North Monroe Community Hospital, appeal a $600,000 judgment founded on a jury verdict in favor of Monroe Medical Clinic, Inc., owned and managed by Dr. Henry Jones, M.D., a family medical practitioner. LRS 51:1401 et seq.
Defendants complain of the jury's findings (four assignments), the trial court's rulings on evidentiary matters (three assignments) and refusal to give requested jury instructions (two assignments). Plaintiff also appeals, seeking to increase the judgment to $1,200,000.
Finding no error or abuse of discretion, we affirm.

POSTURE
While the remaining plaintiff is a medical corporation through which its owner practices medicine, for simplicity, we shall sometimes refer to plaintiff as Dr. Jones, as Dr. Jones's clinic, or as MMC. In dismissing Dr. Jones individually as a co-plaintiff, the trial court appropriately commented that his medical corporation was Dr. Jones's "alter ego."
The corporate defendants are HCA Health Services of Louisiana, Inc., a/k/a North Monroe Community Hospital, and its parent corporation, Hospital Corporation of America, Inc. Defendant Arlen Reynolds was the administrator of the hospital during the time in question in this lawsuit. We shall sometimes refer to the parent corporation simply as HCA and to the other corporation as the hospital or as NMCH.
LRS 51:1405 does not define what is "unfair" or "deceptive," but simply states that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. The trial court's instructions to the jury included this explanation of the nature of the action, which, in our opinion, is correctly derived from the Louisiana statute and case law:
A trade practice is "unfair" when it offends established public policy and when it is immoral, unethical, oppressive, or unscrupulous. A trade practice is deceptive when it amounts to fraud, deceit, or misrepresentation. A trade practice does not have to be both unfair and deceptive to violate the law.
* * * * * *
... plaintiff must prove that the actions of defendants were undertaken with the intent to injure plaintiff's business.
Emphasis in original.
Our statute tracks closely the language of the federal statute, 15 U.S.C. § 45(a), which was intentionally broadly written, leaving the determination of individual violations to the courts. Our legislature has expressed a similar intention in patterning our law on the federal statute. Guste v. Demars, 330 So.2d 123 (La.App. 1st Cir.1976).
Louisiana law grants a private right of action to "any person," natural or juridical, "who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405." Sections 51:1402(8), 15:1409. The term "person" includes, but is not limited to business competitors and consumers. Roustabouts, Inc. v. Hamer, 447 So.2d 543 (La.App. 1st Cir. 1984); Jarrell v. Carter, 577 So.2d 120 (La.App. 1st Cir.1991), writ denied.

FACTUAL SUMMARY
After purchasing undeveloped acreage, HCA caused the hospital to be built in north Monroe in 1983 to compete with Monroe's other private hospital, St. Francis Medical Center. For several decades most Monroe physicians had maintained their offices in the downtown area of the city where St. Francis was located.
*764 To induce physicians to practice on or near the North Monroe hospital "campus," defendants arranged to have a builder and financing readily available to doctors, offering them inducements and lots for the construction and sale or lease of medical facilities. Dr. Jones purchased a lot on the campus on which he constructed his clinic.
To some doctors HCA provided, in some instances, sizeable financial inducements such as rent subsidies, assuming a doctor's lease obligation to his or her lessor of property located elsewhere, income guarantees, low or delayed interest loans, and prepaid cash "relocation expenses" which were often greatly in excess of actual or reasonable moving costs.
HCA offered Dr. Jones $60,000 as a relocation expense to move his clinic from downtown Monroe to the hospital campus. Initially electing to maintain an office near each hospital, Dr. Jones declined the $60,000 offer and accepted instead a mobile office or trailer which HCA provided rent-free while Dr. Jones's clinic was being constructed. Dr. Jones had other doctors in his employ. He and they continued to see patients in both locations until October 1988, when he closed and sold his north Monroe clinic.
Dr. Jones became the first chief of the hospital's medical staff and apparently worked well and harmoniously with Pat Gandy, who was the hospital's first administrator. Defendant Arlen Reynolds replaced Gandy as administrator in September 1984. The relationship between Reynolds and Dr. Jones gradually deteriorated after Dr. Jones resigned as chief of staff of the hospital in November 1984. Dr. Jones thereafter continued to admit patients to the hospital, retaining his status on the medical staff of the hospital until he resigned that privilege January 1, 1989.
Dr. Jones's resignation as chief of staff was prompted primarily by a dispute with Reynolds over whether Reynolds had authority under hospital bylaws to grant what Dr. Jones considered was an "exclusive" radiology contract to a doctor who was "new" to the area. Before this dispute arose, Dr. Jones had questioned the ethical propriety of the hospital's encouraging doctors to respond to the hospital's goal or policy to maintain a profitable patient census (85 percent of patient capacity). Specifically, Dr. Jones had complained to Reynolds that some of his clinic patients were subjected to what he thought were medically unnecessary and expensive consultations and diagnostic procedures by some medical specialists whom he thought were being financially underwritten or supported by the hospital.

LOT ONE DISPUTE
Dr. Jones's differences with Reynolds at first were not public, but were known by some of the hospital employees and by some in the medical community. The more acrimonious and public dispute, which involved all defendants and apparently provoked this litigation, arose in the spring of 1986 over Lot One on the hospital campus contiguous to Dr. Jones's lot and clinic. We relate some of the history of this dispute:
Reynolds sought and gained authority from HCA, and informally agreed, to sell Lot One to Dr. Jones to allow him to expand his clinic. The litigants dispute whether Reynolds gained authority to sell the lot for $1 or for $2 per square foot. Reynolds wrote to HCA on February 18, 1986:
This ... will confirm our conversation last week pertaining to the sale of [Lot One] ... to Henry Jones, M.D.
Dr. Jones has been a driving force in the success of NMCH. He added two ... physicians to his staff ... in July 1985, and now is adding the third ... to our location. Because Dr. Jones was one of the original supporters of our hospital, it would be appropriate to sell the lot to him at the original price of $1.00 per square foot.
... Dr. Jones would like to consummate the sale very quickly, so construction can start ...[1] *765 The two "physicians" Reynolds mentions in the February letter as being "added" to Dr. Jones's staff were young doctors who had become board certified family practitioners in 1985 and were employed by Dr. Jones for one year which would end about July 30, 1986. As the end of their year of employment neared, they began discussing their future plans separately with Dr. Jones and with Reynolds.
Notwithstanding Reynolds' February letter to HCA, mentioned above, Reynolds, shortly after writing the letter, began counseling and assisting the young doctors about their obtaining financing to construct or acquire a medical clinic and family practice of their own. The dispute over Lot One expanded to involve the young doctor-employees, causing Dr. Jones to terminate their employment on July 17, 1986.
On April 1, 1986, Dr. Jones wrote Reynolds about the apparent "misunderstanding or confusion" over his "plans" for expanding his clinic onto Lot One:
Currently, three family physicians are operating out of the existing [north Monroe clinic] ... A fourth physician ... has signed with us ... starting in August 1986. I am ... negotiating with two other[s to join our staff] ... prior to July 1987.
* * * * * *
... My plans would remain basically unchanged regardless of whether or not [the two young doctors now in my employ] remain with [my clinic]. If you and H.C.A. decide to sell me [Lot One], these plans can be accomplished before the end of the year ...
Reynolds did not respond to this letter or to Dr. Jones's phone calls to him in the weeks that followed. Dr. Jones thereafter brought his action against HCA seeking specific performance of the "agreement" to sell him Lot One. See fn. 1.
Soon after that action was brought, Dr. Jones's attorney sent HCA a check on July 14, 1986, for the purchase price of Lot One based on $2 per square foot. HCA replied to Dr. Jones's attorney on July 18:
* * * Dr. Jones had offered, in February... to buy [Lot One] at $1 per square foot. I was unwilling to sell ... for that amount ... We considered offering to sell ... to Dr. Jones for $2 per square foot, but prior to offering to sell [to] him... it became apparent to us that there were physicians who had shown promise of greater support of the hospital and we concluded to sell [Lot One] to those physicians. * * *
HCA thereafter constructed a medical clinic on Lot One for the two young doctors, former employees of Dr. Jones, and sold them the improved lot in October 1987. The young doctors financed the purchase independently of HCA. While their clinic was being built, the young doctors operated their practice in a mobile office or trailer across the street from Dr. Jones's office. HCA provided the mobile site rent-free, as it had earlier done for Dr. Jones during the time his clinic was being constructed.
Reynolds' several "explanations" about why the lot was not sold to Dr. Jones afforded opportunities to Dr. Jones's counsel to impeach Reynolds before the jury and enervate Reynolds' credibility. Reynolds admitted he had HCA authorization to sell Dr. Jones Lot One, but effectively explained to the jury:
We did not accept his offer to buy the lot because, shortly after we were authorized to sell it, his two doctor-employees told us things about his and their "plans" or status that caused us to become confused and to have doubts about whether *766 Dr. Jones was going to remain near the hospital. We then sold Lot One to these two doctors after they terminated their employment with Dr. Jones in 1986 and we provided these doctors with a rent-free mobile office on the hospital campus and with financial assistance to defray some of their office expenses until their practice became profitable.
Other testimony of plaintiff or its witnesses is also summarized:
This hospital is going to beat or "show up" St. Francis Medical Center as a second-rate hospital. We are going to be the primary, number one hospital in the Monroe area;
This hospital needs, and will financially assist and reward "team players" or doctors who will recognize the necessity of maintaining our patient census above the percentage (85 percent) required for profitability. We will educate our doctors how to conform and label their services in the medical and diagnostic categories that public and private health care insurers will pay the most for.
The more pertinent testimony that relates to Dr. Jones after the Lot One dispute surfaced is also summarized:
Dr. Jones, our ex-chief of staff, is no longer considered by the hospital to be a "team player";
A "plan" by the hospital existed to keep Dr. Jones from "getting" patients, but he would "damn well have a hard time proving it";
As patients in the hospital's emergency room, A and B each requested to be attended by Dr. Jones; A was told that Dr. Jones "did not come to the hospital anymore"; B was told Dr. Jones was not on the medical staff of the hospital. C went to the emergency room on a day when Dr. Jones was the listed doctor "on call" and was not referred to him, but to the two young doctors who formerly worked for him.
Dr. Jones's records generally reflect that during the year that the two young doctors were employed in Dr. Jones's clinic (1985-86), the four clinic doctors were responding to a total of two to seven "calls" per week from the hospital's emergency room to attend patients who had no doctor of their own, while in the months after the two young doctors left Dr. Jones's employ, Dr. Jones's clinic was not getting any calls from the hospital.
The evidence presented by defendants (hospital records and testimony) conflicted with, and in some instances denied plaintiff's evidence. Plaintiff's evidence suggested that the conduct of the defendants was intentionally undertaken to financially harm Dr. Jones's medical corporation. Defendants' evidence suggested no such motive or intent, and especially that defendants' conduct toward others was nothing more than good business practice intended to assist others to render greater professional medical service to patients.

RIGHT CONDUCT; WRONG MOTIVE
Thus the jury was presented with two versions of the relevant facts and reasonable inferences which could be drawn concerning the intent of defendants, either of which the jury could have believed. In such circumstances, we are not permitted to say the jury was clearly wrong in drawing the ultimate conclusion that the conduct of defendants toward Dr. Jones was undertaken to financially harm Dr. Jones and was an unfair trade practice. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State through DOTD, 617 So.2d 880 (La. 1993).
In the syllabus of their appellate brief, defendants correctly state the distinction in the law between an innocent purpose and an "unfair" purpose motivating conduct which is facially otherwise lawful:
It is not an unfair trade practice to encourage employees to change employment unless that activity is done for the purpose of harming the employer, as distinguished from helping the employee or oneself. [Citing National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269, 1274-75 (La.App. 4th Cir.1980) and Ahmed v. Bogalusa Kidney Care Center, *767 560 So.2d 485 (La.App. 1st Cir.1990), writ denied.]
See also and compare Bank of New Orleans & Trust Co. v. Phillips, 415 So.2d 973 (La.App. 4th Cir.1982) and Marshall v. Citicorp Mortg. Inc., 601 So.2d 669 (La. App. 5th Cir.1992). In these cases, conduct that was facially otherwise lawful was found to violate the Unfair Trade Practices Law (intentionally filing suit in wrong venue in BNO; use of decreasing credit life insurance for less than loan balance, without notifying borrower that insurance proceeds may not be sufficient to pay loan balance, combined with use of Rule of 78's in rebating unearned interest in Marshall).
Noting that the jury was instructed that MMC was required to prove that the "actions of defendants were undertaken with the intent to injure plaintiff's business," we cannot presume or find that jury was clearly wrong in its verdict. We further note, however, in a private action under LRS 51:1409, a plaintiff cannot sue or recover in a representative capacity simply for unfair or deceptive practices toward others, but must proceed only in his or its individual capacity. Moreover, the statute provides that an award to a plaintiff in an unfair trade practices action must be based on the ascertainable loss of money or movable property and the actual damages sustained. Cf. Roustabouts, Inc. v. Hamer, supra.

ASCERTAINABLE, ACTUAL DAMAGES?
The jury's answers to verdict interrogatories tell us only that defendants "committed unfair trade practices against," and "substantially caused the damages claimed by[,] plaintiff" which the jury assessed at $600,000. We will not specifically speculate otherwise about the jury's findings of fact, but shall address whether $600,000 is the ascertainable loss of plaintiff which is factually and legally supported by the record as just and fair actual damages, within the reasonable province of the jury.
Dr. Jones's principal experts were Dr. Harju, a Ph.D., and Dr. Dalton, a Ph.D.CPA, whose testimony and opinions were based on their understanding of the history and their examination of business records of Dr. Jones's clinic.

PLAINTIFF'S HISTORY
In 1980 Dr. Jones leased a medical clinic office near St. Francis Medical Center in downtown Monroe from Dr. Calvin Folds who earlier had suffered a heart attack. Dr. Jones incorporated his practice as Monroe Medical Clinic, Inc. (MMC), in 1981. When his health improved around 1982, Dr. Folds began working for MMC.
MMC operated its north Monroe clinic from 1983 until that property was closed in October 1988 and sold to another doctor not involved in this action. When MMC closed the north Monroe clinic, Dr. Jones and Dr. Folds ceased practicing together. Continuing his downtown practice, Dr. Jones moved MMC to another downtown location in October 1988. In October 1990, Dr. Jones and Dr. TD incorporated Progressive Health Care, Inc., and continued doing business as Monroe Medical Clinic.
Several other doctors had been employed by Dr. Jones's clinic: Dr. GW for about a year, 1983-84; the two young doctors referred to for about a year 1985-86; Dr. DS thereafter for about a year until December 1987, and Dr. OM for about a year until October 1988. These doctor-employees practiced primarily at the north Monroe office. Dr. Jones sometimes saw patients there, but practiced primarily at the downtown office. Dr. Folds saw patients at both offices.
Plaintiff introduced individual income tax returns for Dr. Jones (1981-1988, 1990) and corporate income tax returns for his incorporated clinic, MMC, for the fiscal years ending 2/28/86-2/28/88. Plaintiff apparently intended to include the corporate returns for the Y/E February 1989 and 1990 as well, but the documents filed for those years are not income tax returns, but merely reports of employee benefit, profit sharing, etc., plans.
Plaintiff also introduced MMC's business records for the years 1985 and 1986, which *768 apparently included patient billing information on ledger sheets and computer printouts. These business records, filed as Exhibit P-21, were returned to Dr. Jones after trial and are not in the appellate record.
According to the tax returns in the record, the corporation's gross receipts or gross profits from both clinic locations were:
$818,425 for F/Y/E 2/28/86 839,792 for F/Y/E 2/28/87 870,932 for F/Y/E 2/28/88
Dr. Jones was originally a co-plaintiff with his medical corporation. His personal income, like the corporation's income, is shown to have increased in 1986 and the years following even though the north Monroe clinic showed a monthly patient and revenue loss after the two young doctors left his employ and began to practice across the street from, and then next door to, his north Monroe clinic.
Notwithstanding that his income, corporate and personal, increased in 1986 and afterward, Dr. Jones contended that his north Monroe clinic would have produced him additional annual income or profit of at least $140,000 a year beginning with the calendar year 1986 but for the unfair conduct of defendants toward him.
His experts opined respectively that the amount of his loss, discounted to present value, ranged from about $1.5 to $3.5 million. Defendants' expert, Henry Little, while critical of the methodology of plaintiff's experts, said that even using the method he criticized he could not estimate plaintiff's loss at more than about $900,000. The jury heard the several experts and awarded $600,000.
Dr. Jones testified that the north Monroe office of MMC was "not profitable" and was "still struggling" in November 1985, after the younger doctors had begun their employment. Dr. Jones said the north Monroe office became profitable in 1986 because "the flu season" increased "dramatically" the patient load. "We were able to increase revenues, and at that time I saw that we were going to make it financially. And this was when I developed plans to expand my business [and buy Lot One] ..."
Dr. Jones testified about the effect on MMC of the departure of the two young doctors in 1986:
Q. Dr. Jones, how long after [they left] did they move in beside you?
A. Well, they moved across the street in a trailer initially. I think it was [for] about a year.
* * * * * *
Q. Well, whenever they opened their practice did you notice any financial effect on your business?
A. Yeah. Well, the financial effect on my business was immediate. Because the effect of the emergency room was immediate.... It was a dramatic effect on my practice.
Q. All right. Did it have any effect on your daily patients that come into your [north Monroe] office?
A. Yes, sir. It was a progressive downhill course.
* * * * * *
Q. All right. Did you notice a drop in the number of patients that you saw daily in your office?
A. Yes, sir.
Q. Okay. Did you have an opportunity to review the number that you had been seeing before and compare it with the number you were seeing after they left?
A. Well, it was just a progressive downhill decrease.
Q. All right. Did that continue for an appreciable period of time?
A. Yes, sir. It continued until I sold my office and left.
Q. All right. And when was that?
A. 1988. October 1988.
Q. When did they build their building adjacent to yours?
A. ... I believe they moved into it in 1987.
Q. All right. And so you essentially were competing one against the other *769 adjacent for that period of time until '88? Is that correct?
A. Yes, sir.
Dr. Jones did not attempt to calculate how much profit he made off of the work of the two young doctors, but left that to his experts.

DR. DALTON
Dr. Michael Dalton, an expert in accounting and valuation of closely held corporations, calculated the present value of Dr. Jones's loss of business income from the north Monroe office of MMC for the period 1986-2006 (when Dr. Jones would reach age 67) as $3.5 million. Dr. Dalton said:
My charge was to determine the damages or the loss of income to North Monroe exclusively. The North Monroe Clinic.
* * * * * *
... I looked at the practice in North Monroe. How it started, how fast it was growing. And I was informed that something had occurred approximately June of 1986 [about a month before the two young doctors left MMC].... So, I limited my data from the inception of the practice until the end of May, 1986 to try to determine how fast the practice was growing, what kinds of revenues was it generating, what were the likely costs associated with generating those revenues, and how profitable it was to that point, and how profitable it was likely to be.
Dr. Dalton noted that the total number of patients seen at the North Monroe office increased from about 600 in September 1985 to about 1,750 in May 1986. During this time, the monthly revenue increased from about $30,000 to about $80,000.
The number of patients that one of the young doctors saw per day increased from about 10 in September 1985 to about 22 in April 1986. The figures were slightly less for the other young doctor, GJ. Dr. Folds, the third doctor sometimes practicing at the North Monroe office, saw there about 19 patients per day in September 1985 and about 25 per day in May 1986.
Dr. Dalton estimated that the clinic's maximum patient capacity was 2,500 per month, with the two younger doctors seeing 40 patients per day and Dr. Folds seeing 30 per day. Maximum capacity would generate $100,000 in monthly revenue, according to Dr. Dalton. In his calculations, Dr. Dalton assumed that it would take about three years for the north Monroe clinic to reach its maximum capacity, although he opined that it may have actually taken less time.
Dr. Dalton made other assumptions:
MMC would have been solely owned by Dr. Jones for at least the first three years after the north Monroe office reached profitability.
The three doctor-employees of MMC would remain at the north Monroe office or be replaced by similarly competent doctors.
The two younger doctors would become partners only if they stayed for at least three years.
Dr. Jones intended to continue operating the north Monroe office for his entire work life expectancy.
The clinic (both locations) would have fixed costs of about $600,000 per year and variable costs of about 8.5 percent of revenue.
The market for patients in the north Monroe area was sufficient for the north Monroe office to grow to where each of the younger doctors would see 40 patients per day and Dr. Folds would see 30 per day.
If any doctor left, he or she would take some patients with him or her. The number lost would depend on how long the doctor had been at the clinic and the number of patient contacts (i.e., someone who saw the doctor only once would be less likely to follow the doctor to a new office than someone who saw the doctor more often).
Any doctor who left would be replaced by a similarly competent doctor-employee.
Any loss resulting from a doctor's departure would eventually be made up by new patients coming from the hospital to *770 see the new doctor. "In other words, it would be unlikely that the business corporation would suffer dramatic losses of patients that couldn't be made up if the doctors left." Our emphasis.
Dr. Dalton said Dr. Jones told him that "a substantial portion" of the clinic's patients came from the North Monroe Hospital emergency room. Dr. Dalton was asked:
Q. Would you agree that two or three patients a week, that might have been available from [the North Monroe Hospital] emergency room [according to Dr. Jones's testimony], would not have a significant impact on the numbers that you have produced here?
A. There's no question about it.... In April of '86, [1,480] patients were seen.... Two or three [a week] is insignificant... no question about that. The issue is, ... was there a sufficient market regardless of where they came from.
According to Dr. Dalton, if the patient market was sufficient for the north Monroe clinic to see 2,500 patients per month, and if his other assumptions were accurate, then the business would have generated $3.5 million in today's dollars for Dr. Jones in cash flow and in residual value from the sale of the business to others when he reaches age 67 in 2006. The loss to Dr. Jones would be only one-third of that amount if two doctor-employees became equal partners with Dr. Jones.
Dr. Dalton did not attempt to calculate by how much or for how long the cash flow would be affected by the turnover of clinic doctors. He simply assumed that the business would have grown to capacity within three years and would have remained at that level indefinitely.
Dr. Dalton said he did not try to determine the cause of any damage to MMC or Dr. Jones.
Q. Could you tell by looking at the records, or looking at the books and based upon your best expert opinion, that something happened to change that business?
A. Definitely.
Q. And could you tell from looking at the records and your best opinions, the best sources that you have available, that it caused the business to decline?
A. Absolutely.
On cross-examination:
Q. In your projections of the values here have you made any allowance for the fact that this firm continued to operate out at North Monroe and generate money?
A. Well, in looking at the financial statements of the firm, and knowing what the revenues and expenses were,... Once [the two young doctors left, MMC was] no longer making a profit. And so ... it would be inconsequential to include the revenues, because I would also have to include the expenses. And the expenses in this case exceeded the revenues.
Q. Of course the expenses went down when those two doctors left?
A. Well, they went down to the extent that the doctors' salaries were no longer payable. But, when Dr. [DS] was hired [in August 1986], then that was an increase in what his salary was.
Q. For one doctor?
A. Sure. ... but what really went down was the patient load.

DR. HARJU
Plaintiff's other expert, Dr. Harju, said he was asked "to attempt to determine the extent of losses that may have been sustained by Dr. Jones as a result of the practice at North Monroe, in particular, going under." He expressed no opinion on the cause of the decline, saying, "I'm simply assuming that North [Monroe] would have been going and is not now.... For whatever reason." Dr. Harju was asked, "From the information that you looked at, from the information that you received from the plaintiff, could you tell that ... there was an impact on this business?" He answered, "Absolutely."
Dr. Harju used the corporate tax return for F/Y/E 2/28/86, which he said "covers the period which was immediately prior to *771 the time that the business began to fall apart up there ... to gain some kind of an understanding of what the nature and value of the business might well have been at a point very near to the time that it actually went down."
Dr. Harju noted that MMC grossed $818,425 from both offices in F/Y/E 2/28/86. Although the tax return showed deductions of $808,679 for business expenses, Dr. Harju opined that many expense items would be considered "frills" by a prospective purchaser of the business, who might determine such items were not absolutely essential to the operation of the business. After reducing the expense figure to about $603,000, Dr. Harju explained:
what you're left with is a figure that someone who owned the place, working the place, would make. And that amount would be [$215,124] for that year. Okay? Now, this is the amount for the whole clinic. See? In other words, that's from all different operations. It's my understanding that the North Monroe [office] was just about to become profitable. It hadn't yet become profitable at this point. Not during this year. See? And as such it was probably being subsidized to a small extent from the operations [downtown].... You expect to make losses in the first couple of years. It's normal in business. At this point it was just breaking even. Just about to break even. And by the next year probably would have broken even.
Dr. Harju then explained that once a business breaks even, by covering its fixed costs, profits increase at a much faster pace. He estimated the fixed costs of MMC to be $618,000 per year and the variable costs to be eight percent of revenue.
Dr. Harju then opined that MMC generated for Dr. Jones about $140,000 [profit] in 1985, but said this would have come from the downtown office. If the business from both offices increased by 15-20 percent over the next year, the north Monroe office could have generated $140,000 [profit] per year "during the next year and for years to come," even if no further growth occurred after 1986, as Dr. Harju explained.
Dr. Harju said the 15-20 percent growth figure he used for 1986 was reasonable because the north Monroe office "had a good bit of capacity yet to come" with its patient load. Dr. Harju said the north Monroe office could have generated more than $140,000 [profit] per year after 1986 if the business continued to grow. Dr. Harju "would have expected [MMC's north Monroe clinic] to have increased over a couple [or] three years beyond that, and then maybe to have declined slightly." Because he projected growth only in 1986, Dr. Harju said his estimate was "exceptionally conservative."
Using the figure of $140,124 per year as the amount of "profit" that Dr. Jones "lost" during each year after 2/28/86 because of the departure of the two young doctors in July 1986, Dr. Harju calculated the present value of Dr. Jones's past loss or "damage" through 1990, the year before the trial, to have been $700,620. Dr. Harju then projected the $140,124 yearly loss over Dr. Jones's remaining work life expectancy of 13.2 years to calculate the then-present value of his future losses as $752,309. These figures total $1,452,929, which Dr. Harju said was his "conservative" estimate of the present value of Dr. Jones's losses.
Dr. Harju testified:
It's true that [Dr. Jones] may have made more money in 1987 than he made in '86, and [more in] '88 than he made in '87, and so on. What we're talking about here are additional earnings that he would have made [from the north Monroe clinic] in addition to the amount of money that he made.
* * * * * *
... I'm not saying that Dr. Jones ... [has] lost all his practice, or he's somehow unable to practice anymore.... What I'm saying is ... that it's entirely probable that he would have made about [$140,000] out of North [Monroe] in 1986. And if he didn't increase it a nickel beyond that he would have made five years *772 worth of that or [$700,000] more than what he [made] over the last five years.
On cross-examination, Dr. Harju admitted that he calculated the past loss figure as if Dr. Jones had received no profit from the north Monroe clinic since 1986 even though he knew that Dr. Jones continued to maintain that clinic for some time. Dr. Harju said he did not assume that MMC's north Monroe clinic ceased operating in 1986, but did assume "that it declined very rapidly thereafter. And especially insofar as the proceeds that would have been realized by Dr. Jones."
Q. Were you of the impression that it shut down in August of '86 except for receiving the receivables that it already had on the books?
A. No. But it's my impression that from about mid-1986 until mid-1987 the business deteriorated very rapidly and fell far short of that break even point that ... was there.
Q. Well, of course at that break even point if you didn't have two doctors there [each] making [$72,000] a year, that break even point changes substantially?
A. It would drop considerably. That's correct.
Q. So, when we talked about you had to have ... [$600,000] a year to break even, that if two doctors leave, that changes it by [$150,000] plus a lot of expenses that go with that? Is that correct?
A. That's right. Uh-huh.
Q. And were you aware they were still taking in as much as [$35,000] a month in 1987?
A. It's possible. Sure. In a given month.
Q. Did you look at that data, or did you just stop in mid-86?
A. I essentially took the figures from 1986 and ... took this figure which is derived from the gross cash flow. And extended that beyond. Now, here's what happens. If there were significant reduction, not only would this have been lost during the next year, but there would actually have been money losses during the next year. In other words, if your gross falls below the break even point, yes, you're still making, you're still bringing a lot of money into the business. But, it doesn't necessarily cover your expenses. And so you're not only losing the profit that you would have made, you're also incurring additional losses.
Q. I understand, doctor. But, you don't know that that's what happened from Monroe Medical Clinic?
A. That's correct.
Q. For all you know they made money when they got [$35,000] a month in '87?
A. I don't believe they did. Not from the data that I saw.... I'm not equipped to tell you precisely at this moment because I wasn't prepared to testify to that.
In calculating Dr. Jones's loss, Dr. Harju assumed that the two young doctors would have continued to work for MMC, or would have been replaced by other doctor-employees who had the same ability to bring in and keep patients and who were similarly paid. Dr. Harju also assumed that any doctor-employees of Dr. Jones would not have been made "partners" in the business, while acknowledging that in such circumstances the profits from the north Monroe clinic would have been shared one-third each between the two and Dr. Jones.
Dr. Harju did not attempt to calculate the fair market value of plaintiff's north Monroe business in 1986. Dr. Harju agreed that, but did not estimate the amount by which, the profit would be decreased by the cost of replacing two doctors, the recruiting expense and the revenues temporarily lost by the clinic during the time it would take for its operation "to get back up to ... a significant level of business ... probably ... a year or two."

MR. LITTLE, CPA
The defense expert, Henry Little, who was accepted as an expert in certified public accounting and business valuation, critiqued the methods used by Drs. Harju and Dalton to calculate the plaintiff's losses. Mr. Little did not make his own evaluation *773 of the losses, but said that if he had done so, he would have compared the value of the clinic in early 1986 (before the internal problems began) with the value at some point in the future to see if there was a decline in patients, charges or profitability.
Mr. Little did not consider the north Monroe practice of MMC to be as stable as Dr. Harju assumed. According to Mr. Little, the high rate of doctor turnover from 1983-1988 and Dr. Jones's frequent absence from the north Monroe office indicated some instability in the practice that would affect Dr. Jones's ability to recruit new doctors to maintain the north Monroe practice.
Mr. Little viewed as unreasonable Dr. Dalton's assumption that there was enough of a patient base for the clinic doctors to see 40 patients a day indefinitely. Mr. Little opined that Drs. Harju and Dalton gave too little weight to the effect of competition in the area, particularly from doctors who formerly worked for MMC. According to Mr. Little, the departure of those doctors from the clinic would affect the clinic's profitability and rate of growth, contrary to Dr. Dalton's assumption that it would not, because doctors who leave typically take whatever patients they are seeing, and it takes time to build the patient load back up even if the new doctors have equivalent work habits and rapport with patients.
Another factor that may have hampered MMC's growth, according to Mr. Little, was the effect of the various lawsuits brought by Dr. Jones, not only on his relationship with North Monroe Hospital, but also "possibly" on his relationship with patients.
Mr. Little considered it unlikely that any doctor-employee of MMC would remain at the clinic for more than about a year if he did not somehow share in the clinic profits, either by becoming a partner or an equity owner, or by otherwise having his compensation tied to the profit he produced for the clinic. If profits were shared, Mr. Little opined that the doctors who practiced at the North Monroe office would receive 80-90 percent of the profits from that office, leaving only 10-20 percent for Dr. Jones, who in Mr. Little's view was a "non-working owner" of that clinic location.
Mr. Little testified about his understanding of how Dr. Harju estimated Dr. Jones's loss on the basis of $140,000 a year. Dr. Harju used the MMC income tax return for F/Y/E 2/28/86, which shows gross income of $818,425, expense deductions of $808,679, and adjusted net income of $11,436. Dr. Harju decreased the expense deduction figure by about $205,000, to about $603,000, by eliminating what he deemed "unessential" expenses: compensation to officers (Dr. Jones), interest, depreciation, cost of pension and profit sharing plans, auto cost, dues and subscriptions, meals and travel, meetings and professional development, promotions and advertising. Dr. Harju then calculated the adjusted net income as $215,000 ($818,000-603,000) and subtracted from this the sum of $75,000, representing the salary that would be paid to a doctor who bought or took over the practice, to arrive at the $140,000 "loss" for 1986.
According to Mr. Little, Dr. Harju "valued" the business as if it were being sold to a third party doctor (by allocating "unessential" expenses as part of gross income), and then subtracted the doctor's salary of $75,000. Mr. Little considered Dr. Harju's method to be an appropriate method of valuation, if Dr. Harju's assumptions were well-founded (stability, lack of competition, etc.), but differed with Dr. Harju as to which expenses and in what amounts would be deemed "unessential" and therefore included as gross income.
Mr. Little said if he had used Dr. Harju's method, he would have projected the adjusted annual net income as $161,000 instead of $215,000. He would have subtracted $75,000 for the doctor's salary, leaving a yearly loss figure of $86,000 instead of Dr. Harju's $140,000. After appropriate discounting, Mr. Little would have projected the present value of Dr. Jones's "loss" as $900,620, rather than Dr. Harju's projected loss of $1.4 million.
*774 While Mr. Little "disagreed" with Dr. Harju's assumptions about the stability of the clinic, he said he would not say that Dr. Harju was "wrong." Mr. Little conceded that reasonable minds might differ with respect to which expenses should be deemed "unessential."
Mr. Little opined that MMC's north Monroe practice "would have continued to grow to some point" after its profits showed a sharp increase Jan.-June 1986, but declined to say how long the increase would have continued:
... Growth can happen for a lot of reasons. That particular spring could have been a very bad flu [season] spring. It could generate a lot of dollars for a practice, for a general practice. You'd have to look at what caused it, or where did it come from. Talk to the doctors who are there and see how they feel about that growth.... I'm not prepared to make a blanket assumption that it would continue. And certainly not at some sharp curve growth.
According to Mr. Little, Dr. Jones's personal income tax returns indicated these earnings from the medical practice (both locations):

1985 132,793
1986 157,751
1987 163,813
1988 258,218*
1989 195,240*

* Dr. Jones had a paid staff position at St. Francis Medical Center for 7½ months from late 1988 ending in 1989, from which he earned $10,000 per month. Even if the entire $75,000 is subtracted for 1988, his income from his private medical practice that year was $183,218.

CONCLUSION
Plaintiff's experts expressed their respective conclusions from projections made on the basis of the business records of plaintiff that the patient load and the monthly revenue from the north Monroe office "really went down" or "deteriorated very rapidly," and thus monetarily in specific amounts after 1986 until that office was closed in October 1988. The jury heard defense counsel ask Dr. Harju, "And were you aware they were still taking in as much as [$35,000] a month in 1987?" Our emphasis. This amount is only $5,000 more per month than the north Monroe office grossed in September 1985, shortly after the two young doctors began their employment ($30,000, according to Dr. Dalton), when the north Monroe office was not profitable. That office was grossing $45,000 more a month, or $80,000, in May 1986 when it was deemed to have reached profitability. If the north Monroe office had remained profitable for the entire year 1986, its profit to Dr. Jones in that year and in the years thereafter would have been $140,000, according to Dr. Harju, or $86,000, according to Mr. Little.
When the respective yearly profit estimates were projected for the period of Dr. Jones's working expectancy, the experts stated the present value of the loss to Dr. Jones as $1,452,929 (Dr. Harju), $3,500,000 (Dr. Dalton), and $900,620 (Mr. Little).
The jury could have concluded on this record, then, that Dr. Jones (MMC), more probably than not, would have continued for his working life expectancy to operate the north Monroe clinic to efficiently accommodate three or more employee-doctors and a maximum patient load of more than 2,000 per month.
Based on the totality of the lay and expert testimony, the jury could have reasonably believed that MMC's north Monroe clinic would have made a profit of some amount in 1986 and the years following but for the conduct of defendants.
Plaintiff insists that we should at least increase the $600,000 award to $900,000, the amount of the loss, according to Mr. Little. Mr. Little, however, criticized the methodology of plaintiff's experts and reached that figure by using the methodology he criticized.
Moreover, we note that this record indicates that none of the experts specifically testified about the comparison of the number of patients and the revenue at the north Monroe location before and after the two doctors left. And, as we have mentioned, some of the business records in the trial court (P-21, plaintiff's billing information *775 on ledger sheets and computer printouts for the years 1985-86) were not included in the appellate record. Exhibit P-21 would not have afforded a basis for the desired comparison, being limited to the years 1985 and 1986.
The jury obviously believed that MMC suffered an ascertainable financial loss that was caused by the defendants' conduct, but not as much as plaintiff's experts projected and not even as much as Mr. Little projected, using the methodology he criticized. Mr. Little's criticism of that methodology may have influenced the jury to reach an award that was two-thirds of Little's projected loss.
The jury was not bound by the respective monetary limits set by the experts, but was free to weigh the facts and assumptions and the methodology upon which the experts reached their respective projections. In short, the jury was free to fix damages in an amount that differed from the experts' conclusions. Smith v. Lumbermen's Mut. Cas. Co., 414 So.2d 1281 (La.App. 3d Cir.1982), writ denied; Poynor v. Cure, 443 So.2d 1151, 1160 (La. App. 5th Cir.1983), writ denied.
We cannot conclude that no award is warranted, as defendants argue, or that the award is abusively low, as plaintiff argues. Under the circumstances of this record, we shall affirm the $600,000 as being a just and fair award.

OTHER ASSIGNMENTS
Exception to Second Amending Petition
Defendants contend the trial court erred in overruling their exception of no cause of action to plaintiff's second amending petition. This argument must be considered in the light of plaintiff's prior petitions.
Plaintiff's original petition, filed March 5, 1987, alleged generally that defendants "are committing unfair trade practices in their operation of ... North Monroe Community Hospital [and that they] have entered into ... contractual relationships [to financially assist] ... `favored' health care providers ... in an effort to increase [defendants'] profits, to influence the physicians' decisions affecting the treatment prescribed for their patients[, and to] ... inhibit the practices of physicians who oppose the defendants' attempts to influence their practice of medicine." Our brackets.
In original paragraph 10 of the petition, plaintiff alleged that in addition to these contractual relationships, defendants "have undertaken steps to promote the `favored' health care provider group and to inhibit the `unfavored' health care provider group." Plaintiff then specifically alleged nine such "steps," which included "Refusal to call `unfavored' health care providers to attend patients requesting them, and instead calling `favored' health care providers to treat those patients," and "Payment of office expenses to `favored' health care providers."
On June 8, 1987, plaintiff filed a first amended petition, amending paragraph 10 to separate the nine "steps" into two categories and to identify them as "examples of some of those steps which have been directed toward the plaintiffs [Category 1, and] ... examples of some of the benefits bestowed upon `favored' health care providers for the purpose of gaining their cooperation [Category 2]."
Plaintiff did not allege dates on which any of these "steps" occurred in the original or the first amended petition. In early 1990, defendants filed a motion in limine seeking to exclude evidence of events which occurred more than one year before suit was filed, contending that the one-year period set forth in LRS 51:1409 for bringing an action for unfair trade practices is peremptive and is not subject to interruption or suspension. Defendants also sought to exclude evidence of events that occurred after suit was filed.
The trial court agreed that the one-year limitation period is peremptive rather than prescriptive, citing Canal Marine Supply v. Outboard Marine, 522 So.2d 1201 (La. App. 4th Cir.1988) and Spencer-Wallington v. Service Merchandise, 562 So.2d 1060 (La.App. 1st Cir.1990), writ denied. The court made these additional rulings:

*776 Acts occurring during the year prior to filing suit are actionable.
Any payments made pursuant to a contract during the year prior to filing suit give rise to a new cause of action and are actionable.
Certain perempted acts may be admissible to prove motive, intent or common plan/scheme, under LCE [Art.] 404(B). However, these claims should be the subject of specific Motions in Limine when the case comes to trial.
Acts that occurred after suit had been filed are not actionable unless the plaintiff amends his pleadings to include such acts.
LCE Art. 404 B(1) provides that evidence of other crimes, wrongs or acts is generally inadmissible to prove the character of a person in order to show that he acted in conformity therewith, but it "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."
On January 17, 1991, plaintiff filed a second amending petition to which defendants filed the exception of no cause of action. The second amending petition further amended Paragraph 10 to add nine more examples to Category 2, including payments by defendants to area doctors in the form of rent subsidies, income guarantees, recruiting fees, financing to build an internal medicine subspecialty clinic, and deferral of monthly payments on the construction loan. Again, no dates were alleged.
In support of their exception of no cause of action, defendants argued that any acts referred to in paragraph 10 of the second amending petition which occurred more than one year before the original petition was filed on March 5, 1987, or which occurred after March 5, 1987 but more than one year before the second amending petition was filed on January 17, 1991, were perempted. Defendants also filed a motion in limine, seeking to exclude evidence of acts occurring after Dr. Jones resigned from the staff of North Monroe Hospital on January 1, 1989.
The trial court ruled that any claims in the second amending petition based on acts which occurred before March 5, 1987, had perempted and were unactionable, but that plaintiff could introduce evidence of those acts to show motive, intent or plan, under LCE Art. 404 B(1).
With respect to acts which occurred after Dr. Jones resigned from the hospital staff on January 1, 1989, the court found that they "are not to be considered as a contributing cause of plaintiff's damages and are not actionable. However, these acts may be used as evidence of the alleged larger scheme of unfair trade practices."
With respect to acts which occurred after March 5, 1987 and before January 1, 1989, the court said:
... Defendants claim that [these acts] do not arise out of the same transaction or occurrence set forth in the original petition... [and that they] had not occurred at the time the original suit was filed, thus [they] cannot relate back to the original filing date and are perempted. The Court disagrees.
Plaintiff filed suit seeking damages based upon allegations of unfair trade practices in violation of La.R.S. 51:1401, et seq. In [its] original petition, the plaintiff alleges that the acts of unfair trade practices are continuing. Even though the amending petition is based on new events that came into existence after the filing of suit, those events are a continuation of the original cause of action. The new events are grounded in the same cause of action, in that [they] are benefits given to area physicians in an attempt to influence their admission and treatment of patients. These new allegations comprise evidence used to prove the original cause for the lawsuit, the alleged unfair trade practices of the defendants. The plaintiff's Second Amending Petition merely expands on the first petition and includes more alleged benefits and oppressive acts *777 which continued past the original date of filing.
For the above reasons, the Court rules that the Second Amending Petition should relate back to the filing of the original petition and thus, the events occurring after suit was filed are not perempted....
Our brackets and emphasis.
Defendants contend the trial court erred in this ruling because the "claims" alleged in the second amending petition constitute new "causes of action" that were extinguished by peremption before that petition was filed and they cannot be revived by the "relation back" theory. CCP Art. 1155. We cannot agree.
The record supports the trial court's conclusion that the second amending petition did not allege new causes of action, but simply alleged additional examples of the types of benefits afforded by defendants to area doctors that plaintiff had originally alleged were used in an unlawful manner.
In any event, the "relation back" theory has been applied to claims governed by a peremptive rather than a prescriptive period. See and compare Giroir v. South La. Medical Ctr., 475 So.2d 1040 (La.1985); Thibaut v. Thibaut, 607 So.2d 587, 608-609 (La.App. 1st Cir.1992), writs denied; and Meadoux v. Hall, 369 So.2d 240 (La.App. 4th Cir.1979), writ denied.
We cannot say the trial court erred in overruling the exception.
Evidence of Events Outside Actionable Period
Defendants also claim they were denied a fair trial because the great portion of plaintiff's evidence concerned events that were not actionable, having occurred more than one year before suit was filed or after Dr. Jones resigned from the hospital's staff. Defendants make this contention while generally conceding that the trial court had discretion to admit such evidence solely for the limited purpose of showing motive, intent or plan under LCE Art. 404 B(1).
Defendants argue, however, that the court abused its discretion by admitting too much of the Art. 404 B(1) evidence, allowing it to become "the centerpiece of plaintiff's case" and causing defendants great prejudice. Defendants assert that the trial court "allowed plaintiff to use Art. 404 B(1) as a subterfuge to get all of this [evidence] before the jury as peripheral matter when [this evidence] was, in truth, the central basis for plaintiff's appeal to the emotions of the jury." Defendants contend the admission of this "extraneous evidence ... obscure[d] the paucity of [any] legitimate basis for [plaintiff's] claim." Our brackets and emphasis.
Before the first witness was called, the trial court informed the jury:
... in this particular case there may be some evidence admitted which you may consider only for a very limited purpose. This evidence, for the most part, will be referring to events which occurred before March the 5th of 1986 or after December 31st, 1988. That evidence is not part of the plaintiff's claim, but it is admissible for the limited purpose of showing a pattern or a system or ... of corroborating what the plaintiff claims happened between March 5th of 1986 and December 31st of 1988....
The court repeated the admonition in its charge to the jury:
In this case, the plaintiff has sued the defendants alleging that they committed unfair trade practices against the plaintiff between March 5, 1986 and December 31, 1988....
As I have told you, in this case, plaintiff has been allowed to present certain evidence which you may consider only for a very limited purpose. For the most part, this evidence will refer to events before March 5, 1986, or after December 31, 1988. I must again caution you to be careful when you consider such evidence, to remember that it is not a part of plaintiff's claim. That is, this evidence may not be taken by you as proof of any basis for recovery by plaintiff, or of liability on the part of defendants. It is admitted for the limited purpose of indicating possible knowledge, intent, design, *778 or as it relates to the events which occurred between March 5, 1986 and December 31, 1988.
Much of the evidence presented by the litigants as to liability, and most of their evidence as to damages, concerned only the Lot One dispute and the departure of the younger doctors from MMC. These events occurred within the year before the original petition was filed. The jury was charged with the express responsibility of determining whether defendants' actions toward MMC and Dr. Jones were taken innocently and simply as good business practice, or were taken deceitfully and with the motive or intent to financially harm the plaintiff. The evidence of defendants' conduct outside the actionable period was relevant to this determination.
While some of plaintiff's evidence clearly concerned events for which defendants could not be held liable, we cannot agree with defendants' claim that there was a "paucity" of evidence concerning events for which they could be held liable. The jury was instructed, properly and with adequate emphasis, in our view, as to the limited purpose for which the evidence of "other acts" was admitted.
We cannot say the trial court abused its discretion or exceeded the bounds of LCE Art. 404 B(1) by allowing the jury to hear the evidence of which defendants complain.
Judgment Against HCA
During the trial, defendants moved for a directed verdict dismissing Hospital Corporation of America, Inc., whose principal offices are in Nashville, Tenn. HCA argued that the evidence did not present a factual basis for any finding of liability on the part of HCA. The trial court denied the motion. The jury specifically found that HCA, as well as the hospital and its administrator, Arlen Reynolds, were liable to the plaintiff.
Defendants reiterate on appeal their contention that "there is, in fact, no reason for any claim against HCA to have gone to the jury, and none to support the verdict against it.... Plaintiff played with heavy hand upon the size of HCA as a major part of its effort to draw upon the biases of this jury against big, foreign corporations and against the health care industry ... This tactic was highly prejudicial to the other defendants, and it was improperly permitted as a result of improperly having HCA before the jury at all."
The record belies defendants' contention that HCA was "merely ... a shareholder in the corporation which owns and operates the hospital." Arlen Reynolds, the hospital administrator, obtained authority from HCA with respect to selling Lot One, whether to Dr. Jones (MMC) or to his two doctor-employees. Dr. Jones's offer to purchase Lot One was ultimately declined by letter from HCA in Nashville to Dr. Jones's attorney, because "there were physicians who had shown promise of greater support of the hospital and we concluded to sell the property to [them]." Our emphasis.
HCA's participation in real estate transactions and other financial transactions with the two young doctors and with other doctors simply illumined the motive for the conduct of the hospital and HCA toward Dr. Jones and MMC, which the jury implicitly found to be defendants' concern for "profits" and "team players" who, as HCA's letter states, showed "promise of greater support of the hospital [than Dr. Jones had shown]." Our emphasis.
The question of HCA's involvement and motive was properly presented to the jury. The jury's finding of liability on the part of HCA is supported by the evidence and is not clearly wrong.
Jury Charges"Law of the Case"
With respect to plaintiff's claim of unfair trade practices founded on the contracts between the hospital and other local doctors for income guarantees, prepaid relocation "expenses," rent subsidies, etc., defendants asked the trial court to instruct the jury that plaintiff was required to prove not only that such contracts existed, but that "the defendants contracted with physicians in order to induce them to unnecessarily admit or improperly treat patients; and that the physicians did in fact, *779 in return for these contracts, unnecessarily admit and improperly treat patients ..."
Defendants argued that the requested instruction was "the law of the case," that was stated in Monroe Med. Clinic v. Hosp. Corp. of Am., 522 So.2d 1362 (La.App. 2d Cir.1988), wherein we reversed a judgment dismissing this action of MMC and Dr. Jones on defendants' exception of no cause of action. The trial court refused to give the requested charge.
Defendants' argument in this respect is that this court "held" in the prior opinion "`that plaintiff might prevail if it could prove the ... contracts [were] tied to unnecessary treatment and admission ...' This was the essence of [the] ruling which saved this suit from dismissal for failure to state a cause of action."
The language in our 1988 opinion, however, was not as terse or as limited as defendants argue. We quote in part the language from that opinion:
... Broadly interpreted, [plaintiffs'] allegations assert that defendant is influencing patients' choices and the decisions of "favored" health care providers through the unethical and oppressive use of economic advantage to the detriment of the plaintiffs.
[Defendants] ... contend that [their] actions... are simply sound business practices, the exercise of permissible business judgment and/or appropriate free enterprise transactions. Such may well be the case. However, ... on the allegations asserted by the plaintiffs under existing law, they are entitled to a trial to determine whether the actions they allege are unethical, oppressive or unscrupulous, or whether they are simply the appropriate exercise of good business judgment and the proper workings of free enterprise.
522 So.2d at 1365; our brackets.
The trial court instructed the jury that "A trade practice is `unfair' when it offends established public policy and when it is immoral, unethical, oppressive, or unscrupulous." The charge that was given is consistent with our 1988 opinion, partially quoted above.
This assignment does not present reversible error.
Jury ChargesPublic Hospitals
Defendants also complain of the trial court's refusal to instruct the jury that public hospitals are statutorily authorized to offer financial inducements to doctors, similar to those offered by the private hospital here, to enable the public hospitals to compete more effectively with private hospitals. See LRS 46:1071 et seq. Defendants reason that if public hospitals are authorized to enter into such contracts, then similar contracts entered into by a private hospital cannot be deemed to offend public policy and thus to constitute unfair trade practices.
The jury heard the testimony of Wayne Bing, the administrator of the Morehouse General Hospital in Bastrop, which is a public hospital. Bing described the financial inducements that his hospital uses to recruit doctors to its staff, including income guarantees, free office space and payment of routine office expenses, all for the first year of the doctor's association with the hospital, as well as offers to build offices suitable for the doctor's practice and to sell or lease the buildings to the doctor. Bing said the hospital does not require the doctors who accept financial assistance from the hospital to either admit patients there or treat patients in a certain manner.
From Bing's testimony, and that of other witnesses with respect to private hospitals, the jury heard that the types of financial inducements offered by defendants were common in the industry. Many of the doctors who accepted financial assistance and other inducements from the defendants also squarely denied before the jury that their decisions to admit patients to the hospital or to treat them in a certain manner were influenced by the assistance they received from defendants.
The threshold issue before the jury was not whether hospitals, public or private, may legitimately offer financial inducements *780 to some doctors, but whether defendants' overall conduct was unfair or deceptive insofar as concerned plaintiff, and within the meaning of the jury charges on the law, and whether that conduct was intended by defendants to financially harm plaintiff. The second issue was whether defendants' conduct damaged the plaintiff, and, if so, in what ascertainable amount.
The "fact" that public hospitals are statutorily authorized to offer inducements suggests that private hospitals may do the same. This fact, however, does not suggest, in our view, that either a public or private hospital is "immune" and may not offend public policy under any circumstances by offering inducements for a wrong motive with the intent to financially harm another doctor or medical clinic.
We find no error in the trial court's refusal to give the charges of which defendant complains on appeal.
Exclusion of Evidence of Similar Practices at Other Local Private Hospitals
Many of the doctors called by the plaintiff to testify about the financial assistance they received from North Monroe Hospital practice or have practiced at one or both of the other private hospitals in the area, St. Francis Medical Center in Monroe, and Glenwood Regional Medical Center in West Monroe. When some, but not all, of these witnesses testified that St. Francis and Glenwood did not offer financial inducements to their staff doctors, defendants subpoenaed the records of St. Francis and Glenwood to attempt to counter their testimony. St. Francis and Glenwood each filed a motion to quash the subpoenas, which the trial court granted.
Defendants thereafter elicited testimony from both plaintiff and defense witnesses that financial and other inducements were offered by St. Francis or Glenwood to recruit doctors to their respective medical staffs. Notwithstanding this testimony, defendants contend the trial court's ruling on each motion to quash was erroneous and unfair.
On the circumstances of this record we cannot agree. As noted above, the jury heard ample evidence that such inducements are common in the public and private hospital industry, locally and nationally. By effectively questioning witnesses, defendants placed before the jury evidence of similar practices at the other local private hospitals. The critical issue is not what the defendant hospital or other hospitals did, but the purpose or motive for what defendants did with respect to the plaintiff.
Any assumed error in the trial court's ruling, under these circumstances and in the light of the other instructions, is harmless and inconsequential error.

DECREE
The judgment, at the cost of defendants, is AFFIRMED.
LINDSAY, J., dissents and assigns reasons.
LINDSAY, Judge, dissenting.
I respectfully dissent. I do not agree with the majority that the jury was correct in finding that the defendants engaged in unfair trade practices against the plaintiff. Accordingly, I oppose any award of damages in this case.
In finding that the trial court judgment should be affirmed, the majority has erred. When the evidence is thoroughly considered and weighed against the applicable legal standards, it is apparent that the judgment should be reversed.

LAW RELATING TO UNFAIR TRADE PRACTICES
The Louisiana Unfair Trade Practices and Consumer Protection Law is set forth in LSA-R.S. 51:1401 et seq. LSA-R.S. 51:1405(A) provides that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful. The statute does not define unlawful methods of competition but relegates to the courts the task of determining, on a case-by-case basis, whether particular conduct violates the statute. Core v. Martin, 543 So.2d 619 (La.App. 2d Cir.1989); Dufau v. Creole Engineering, *781 Inc., 465 So.2d 752 (La.App. 5th Cir.1985), writ denied 468 So.2d 1207 (La. 1985); Coffey v. Peoples Mortgage and Loan of Shreveport, 408 So.2d 1153 (La. App. 2d Cir.1981); Jarrell v. Carter, 577 So.2d 120 (La.App. 1st Cir.1991), writ denied 582 So.2d 1311 (La.1991).
The jurisprudence has provided the definition of what practices are considered "unfair." A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers. Consumers include business competitors. Ahmed v. Bogalusa Kidney Care Center, 560 So.2d 485 (La.App. 1st Cir. 1990), writ denied 564 So.2d 324 (La.1990); Gautreau v. Southern Milk Sales, Inc., 509 So.2d 495 (La.App. 3d Cir.1987); Coffey v. Peoples Mortgage and Loan of Shreveport, supra; Roustabout, Inc. v. Hamer, 447 So.2d 543 (La.App. 1st Cir.1984).
Further, conduct is deemed unlawful if it involves fraud, misrepresentation, deception, breach of fiduciary duty, or other unethical conduct. Core v. Martin, supra; Pizzaloto v. Hoover Company, 486 So.2d 124 (La.App. 5th Cir.1986), writ denied 488 So.2d 202 (La.1986).
LSA-R.S. 51:1409 provides a private right of action to recover actual damages under the unfair trade practices law to "any person who suffers ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by LSA-R.S. 51:1405."
LSA-R.S. 51:1402(8) defines person as a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity. Jarrell v. Carter, supra.
LSA-R.S. 51:1409(E) states that the action provided by the unfair trade practices law must be instituted within one year from the time of the transaction or act which gave rise to the right of action. This provision has been interpreted as a peremptive, absolute uninterruptible time period. A suit must be filed within one year from the time of the transaction or act which gave rise to the right of action. Canal Marine Supply v. Outboard Marine, 522 So.2d 1201 (La.App. 4th Cir.1988).
The evidence adduced in this case must be examined according to the legal principles set forth above. Further, in reviewing the jury verdict in this case, I note that it is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review is not to decide factual issues de novo. Rosell v. ESCO, supra.
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of the trier of fact; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, supra.
However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, supra.
In applying these legal standards to the facts of this case, the record does not support the majority's finding that the sale of Lot Number One to anyone other than the plaintiff constitutes an unfair trade practice or that the defendants' dealings with the two physicians employed by the plaintiff, *782 Dr. Gary Jones and Dr. Kerry Anders, constituted unfair trade practices. Further, there is insufficient evidence to support a finding that the defendants diverted patients or intended to harm plaintiff's medical practice.

LAW APPLIED TO THE FACTS OF THIS CASE
The parties tried this case in the lower court from August 12 through August 30, 1991, a period of three weeks. The appellate record is in excess of seventeen volumes. During these three weeks of trial, the plaintiff spent the majority of his time attempting to support his numerous allegations against the defendants involving Medicare fraud, overtreatment of patients by other doctors and clinics and financial relationships between the defendants and other medical specialists, none of which related to any unfair trade practices attributable to the defendants against the plaintiff. All this evidence, none of which proved any unfair trade practice against the plaintiff, was admitted by the trial court, ostensibly for the purpose of showing knowledge, intent, motive and system by the defendants to damage plaintiff's business. The effect, however, was simply to prejudice the defendants in the eyes of the jury and probably contributed to the finding of liability and the award of damages.

Lot Number One
The majority finds that the dealings between the defendants and the plaintiff concerning "Lot Number One" constitute unfair trade practices. The majority also finds that the defendants engaged in unscrupulous dealings with the two doctors at Monroe Medical Clinic, Dr. Gary Jones and Dr. Kerry Anders, regarding the sale of the lot with the intent to damage the plaintiff. These findings are not supported by the record.
In early 1986, Dr. Henry Jones began efforts to buy a tract of land known as "Lot Number One," at the North Monroe Community Hospital campus, allegedly to expand his existing clinic building and parking area. This lot was owned by HCA. The lot was located adjacent to Dr. Jones' existing building. HCA had no objection to the sale, but left the final decision up to the hospital.
North Monroe Community Hospital decided not to sell the land to Dr. Henry Jones. In response to this decision, Dr. Jones filed suit for declaratory judgment against HCA on theories of estoppel, unjust enrichment, negligent misrepresentation and detrimental reliance. He claimed that there was an oral agreement of sale or, in the alternative, an agreement to sell the property to Dr. Henry Jones.
HCA subsequently obtained a summary judgment in the trial court, rejecting Dr. Jones' claims concerning the existence of a contract of sale, the existence of a contract to sell, estoppel of the defendants from denying the existence of a contract to sell and an injunction. The trial court's ruling granting the summary judgment was affirmed in Jones v. HCA, 516 So.2d 1175 (La.App. 2d Cir.1987), with this court finding that Dr. Jones could assert such rights to the property only with a written contract. Because there was no such written agreement, the court found Dr. Jones had no right to the property.
Further, the record does not support the majority's view that the defendants' action in selling the property to two former employees of the plaintiff constitutes an unfair trade practice. The majority opinion states, "The dispute over Lot One expanded to involve the doctor-employees, causing Dr. Jones to terminate their employment on July 17, 1986." This statement is factually incorrect. The doctors were not terminated due to negotiations over Lot Number One.
Dr. Kerry Anders and Dr. Gary Jones, the brother of Dr. Henry Jones, signed a one-year contract to work for Monroe Medical Clinic beginning in August, 1985. Friction between Drs. Henry Jones, Gary Jones and Kerry Anders began almost immediately. These problems concerned the conduct of the medical practice and involved personality conflicts. Before the end of 1985, Dr. *783 Henry Jones suggested that the two doctors should purchase the Monroe Medical Clinic, although no action was taken on the suggestion at that time.
By early 1986, Dr. Gary Jones and Dr. Anders had decided not to remain at Monroe Medical Clinic after the expiration of their one-year contract. They indicated an interest in buying the North Monroe location of Monroe Medical Clinic, as previously suggested to them by Dr. Henry Jones. After discussions among the doctors concerning the possible sale of the clinic, Dr. Henry Jones offered to sell the building to Dr. Gary Jones and Dr. Anders for $550,000. Because the two doctors had no business expertise, they sought advice from Arlen Reynolds, the hospital administrator. It was decided that an appraisal of the Monroe Medical Clinic building should be obtained and that the doctors should seek financing from local banks.
The Monroe Medical Clinic building was appraised at approximately $400,000. However, Dr. Henry Jones refused to reduce his asking price following the appraisal.
Relations between the doctors at Monroe Medical Clinic continued to deteriorate. On June 30, 1986, Dr. Gary Jones and Dr. Anders were given written notice that their employment contracts would not be extended beyond July 31, 1986. However, on July 17, 1986, without prior warning, Dr. Henry Jones gave each doctor a letter instructing them to vacate the premises by 5:00 p.m. that day. (Dr. Henry Jones contended that he merely sent the doctors on "vacation" for the remainder of their employment contract.) At that time, no negotiations had begun between the doctors and the defendants for the purchase of Lot Number One.
Pursuant to their termination notices from Monroe Medical Clinic, Dr. Gary Jones and Dr. Anders departed. They had no place to go to see their patients. They again asked for advice and assistance from the hospital. They were then allowed to see their patients in the emergency room at North Monroe Community Hospital. Eventually they were furnished with a trailer by HCA in which to practice. At that time, after their termination by Dr. Henry Jones, they began negotiations with the hospital for the purchase of Lot Number One. However, it was not until more than one year later that these doctors ultimately finalized the purchase of Lot Number One and constructed a building thereon. It is also important to note that the doctors obtained their own financing for the purchase of the land and building. This venture was not financed by the defendants.
In August, 1986, Monroe Medical Clinic sued Dr. Anders, Dr. Gary Jones and HCA concerning Lot Number One. Monroe Medical Clinic claimed that negotiations for the purchase of the property by Dr. Gary Jones and Dr. Anders began while the doctors were still employed by Monroe Medical Clinic. Therefore, Monroe Medical Clinic claimed that it had the right to purchase the property. The defendants filed an exception of no cause of action which was sustained by the trial court. The suit was dismissed, and the judgment was not appealed.
Also in August, 1986, Dr. Henry Jones and Monroe Medical Clinic filed suit against Dr. Gary Jones and Dr. Anders for unfair trade practices. This suit was ultimately dismissed by Dr. Henry Jones.
Even though Dr. Jones contended that the defendants engaged in unfair trade practices by refusing to sell Lot Number One to him and then selling it to his former employees, these facts do not constitute unfair trade practices under the statute and the jurisprudence. Dr. Jones had previously filed lawsuits independent of the present action to enforce the sale of the property to him. This court found that Dr. Jones had no legal claim to the property. The defendants, owners of the disputed property, had every right to sell the property to whomever they chose. This conduct did not offend established public policy nor was it unscrupulous, unethical, substantially injurious to the plaintiff nor did it involve fraud, misrepresentation, deception, breach of a fiduciary duty, or other unethical conduct. Therefore, the trial court could not correctly find that this conduct *784 constituted an unfair trade practice. The jury verdict simply is not supported by the law and the evidence.

Termination Of Employees
The plaintiff also asserted that the defendants deliberately damaged its business by hiring away two of its employees, Dr. Gary Jones and Dr. Kerry Anders. The majority merges this argument with arguments regarding the sale of Lot Number One. As stated above, these doctors did not pursue the purchase of Lot Number One until after their termination by Dr. Henry Jones. That termination had nothing to do with Lot Number One. Based upon review of the record, I fail to find that any actions taken by the defendants regarding these two doctors constituted unfair trade practices.
When Dr. Gary Jones and Dr. Kerry Anders began their employment at Monroe Medical Clinic in August, 1985, each doctor signed an employment contract agreeing to work at the clinic for one year. At trial, Dr. Henry Jones testified that after hiring Dr. Gary Jones and Dr. Kerry Anders, he tried to satisfy the two doctors by purchasing computer equipment they wanted and finally agreeing to allow them to engage in the practice of obstetrics. However, he claimed that the doctors were never satisfied and were too competitive with one another. Dr. Henry Jones stated that Dr. Anders approached him about purchasing the Monroe Medical Clinic building at the North Monroe Community Hospital campus. He claimed the next thing he knew, the building was being appraised. He further claimed that the doctors began telling patients to "come to their new office, wherever it was." At that point, Dr. Henry Jones testified that he decided that he did not like the turmoil within the practice and decided not to renew the doctors' employment contracts.
The testimony of both Dr. Gary Jones and Dr. Kerry Anders is diametrically opposed and contradictory to that of Dr. Henry Jones. Dr. Kerry Anders testified that he began working for Monroe Medical Clinic on August 12, 1985. He stated that approximately 10 weeks after he and Dr. Gary Jones began working at the clinic, Dr. Henry Jones told them he thought it was a mistake to hire them and that they should buy the office at the North Monroe Community Hospital campus by December of that year because of the new tax laws. The two doctors were hesitant to undertake this financial obligation because their practices were new and they had no business expertise.
Dr. Anders further testified that it was Dr. Henry Jones who suggested that they speak with Mr. Arlen Reynolds about financing the purchase of the building. The two doctors did consult with Mr. Reynolds, who advised them to establish a line of credit at a local bank and aided in having the Monroe Medical Clinic building appraised. Dr. Anders testified that later, Mr. Joe Calcutt, the chief financial officer of the North Monroe Community Hospital, mentioned options available to them other than buying the Monroe Medical Clinic building, such as purchasing property near the hospital and constructing their own building. He further testified that even though the defendants hired Cindy Leight, a specialist in opening and marketing new medical practices, to assist them, they declined her services.
Dr. Anders testified that prior to the end of their employment contracts, the two doctors were given 30 days notice that their contracts would not be renewed. After Dr. Henry Jones informed them of this nonrenewal, they were approached by the North Louisiana Clinic, but both doctors declined the offer to join this group of physicians.
On July 17, 1986, before their one year employment contract ended (and before the end of the aforementioned 30 day notice), both doctors received letters from Dr. Henry Jones asking them to turn in their office keys and beepers and to remove their personal effects by the end of the day.
Dr. Anders testified that he and Dr. Gary Jones felt that they had been terminated by Monroe Medical Clinic, and they went to Mr. Arlen Reynolds at the hospital to seek advice. It was then that the defendants *785 ordered a trailer in which the two doctors could practice until they could arrange financing for an office building. Until the trailer arrived, the defendants allowed the doctors to see patients in the emergency room of the North Monroe Community Hospital.
Dr. Anders testified that the new office building and property were purchased from the defendants, but that he, Dr. Gary Jones, and the other physicians practicing in the building secured their own financing and have always made the payments on the note and mortgage covering the building and property.
Dr. Anders' testimony was corroborated by that of Dr. Gary Jones, who testified that Dr. Henry Jones told the two doctors that he had decided that he did not want to have physician employees and did not wish to maintain two offices. Dr. Gary Jones also testified that his brother, Dr. Henry Jones, told him he wanted them to buy the North Monroe office.
The record does not support the view that the defendants enticed Dr. Anders and Dr. Gary Jones to leave the Monroe Medical Clinic or that any such actions were undertaken with the intent to harm the Monroe Medical Clinic. The record is clear that Dr. Henry Jones, Dr. Anders and Dr. Gary Jones were not satisfied with their working arrangement almost from the beginning of their association. The two doctors were informed by Dr. Henry Jones that their employment contracts would not be renewed and then their employment with Monroe Medical Clinic was abruptly terminated by Dr. Henry Jones. Under such circumstances, it cannot be said that the defendants caused the doctors to leave Monroe Medical Clinic.
Even if the testimony of Dr. Henry Jones is accepted and the testimony of Dr. Gary Jones and Dr. Anders is discounted, the record does not support the contention that the defendants enticed the doctors away from Monroe Medical Clinic. There is no showing in the record that the defendants approached the doctors prior to the doctors asking Arlen Reynolds for advice. Only then was advice given. There is no evidence in the record that Mr. Reynolds initiated this contact. While the two doctors were employed by Monroe Medical Clinic, the only actions shown to have been taken by the defendants on behalf of the doctors is the obtaining of the appraisal of the Monroe Medical Clinic building, the suggestion by Mr. Joe Calcutt that the doctors might possibly purchase property and construct their own building, and the offer to provide the doctors with professional help in setting up an office. (As stated previously, the doctors declined the latter offer of the services of this professional.)
After the doctors left their employment at Monroe Medical Clinic, they were temporarily allowed to see patients in the emergency room of the hospital and were later furnished with a trailer in which to practice. (I note that the defendants also furnished a trailer to Monroe Medical Clinic when it first moved to the North Monroe Community Hospital campus.) Also, it was not until 1987, after the doctors left Monroe Medical Clinic, that they purchased Lot Number One.
The jurisprudence in this state has not specifically ruled on the issue of whether a third party, such as the defendants in this case, may commit an unfair trade practice against a business competitor by hiring away its employees. However, the jurisprudence has considered the issue of unfair trade practices by employees who leave employers and set up competing businesses. In determining what constitutes an unfair trade practice, the courts have focused on the actions taken by employees before they leave their employers. In Ahmed v. Bogalusa Kidney Care Center, 560 So.2d 485 (La.App. 1st Cir.1990), writ denied 564 So.2d 324 (La.1990), the plaintiff filed suit, claiming that a competing dialysis center enticed a physician, the staff and the patients of the plaintiff's center to the defendant's center. The court granted the defendant's motion for directed verdict, and the appellate court affirmed that decision.
The court found that the physician was not an employee of the plaintiff's dialysis *786 clinic, therefore, he was not enticed away. Further, the patients of the plaintiff's dialysis center approached the owner of the defendant's center and asked him to build a new dialysis center.
Core v. Martin, 543 So.2d 619 (La.App. 2d Cir.1989), concerned alleged unfair trade practices between two veterinarians who practiced together. Upon termination of their relationship, the plaintiff sued the defendant for amounts due under an employment contract. The defendant reconvened, alleging unfair trade practices. The defendant objected to the plaintiff taking a list of patients with him when he left the practice. The court found that the plaintiff took only the names of clients whose pets he had personally treated. The court found that there was no diversion of patients before the end of the employment relationship between the plaintiff and defendant.
In Dufau v. Creole Engineering, Inc., 465 So.2d 752 (La.App. 5th Cir.1985), writ denied 468 So.2d 1207 (La.1985), the court found that the solicitation and diversion of the employer's customers prior to termination of employment constituted unfair competition, entitling the plaintiff to recover damages.
In the present case, the evidence does not show that the defendants enticed Dr. Gary Jones and Dr. Anders away from Monroe Medical Clinic. The record is clear that the relationship between the physicians practicing at Monroe Medical Clinic was not satisfactory and they were terminated by the plaintiff. There is no showing that any practice which was unethical, oppressive, unscrupulous, against public policy or substantially injurious to Monroe Medical Clinic was employed in this case in connection with Dr. Anders and Dr. Gary Jones. Therefore, the jury could not properly rely upon the departure of these doctors to find that the defendants engaged in any type of unfair trade practices against the plaintiff.

Other Claims Of Unfair Trade Practices
The majority notes that testimony was presented to the effect that Dr. Henry Jones was no longer a "team player" for the hospital and that a plan by the hospital existed to keep Dr. Jones from obtaining additional patients. As evidence of an alleged plot against Dr. Jones, the plaintiff sought to establish by the testimony of Stanley Palowsky, a building contractor employed by the North Louisiana Clinic, a group of medical specialists unrelated to this case, that he overheard a barroom conversation in which a hospital employee, Cheryl Keller, said that there was a plan by the defendants to prevent Dr. Henry Jones from getting any more patients. Ms. Keller testified at trial, denying that she ever made such a statement.
In support of its opinion, the majority also refers to Dr. Jones' claim that emergency room patients, who requested that he be called, were told that Dr. Jones did not practice at the hospital any more. Also, Dr. Jones contended that the hospital failed to give him his fair share of referrals from the emergency room of patients who reported for treatment and who did not have a physician. These statements are not supported by the record and are uncontrovertibly refuted by the documentary evidence.
The plaintiff contends that Dr. Henry Jones' office manager, Ms. Beth Toney, noticed that before Dr. Gary Jones and Dr. Anders left, the clinic was seeing two to seven patients per week from the North Monroe Community Hospital emergency room. This number included both established patients and unassigned call patients and included referrals to all the physicians at Monroe Medical Clinic. Ms. Toney stated that after Dr. Anders and Dr. Gary Jones left, the clinic stopped receiving any emergency room referrals.
Although Ms. Toney claimed to have checked the records of the Monroe Medical Clinic for one year in order to establish her hypothesis that the plaintiff was no longer receiving any emergency room referrals, no records verifying Ms. Toney's statement were introduced into evidence.
On cross examination, Ms. Toney was questioned about the number of doctors on *787 the emergency room list prior to the departure of Dr. Anders and Dr. Gary Jones. At that time, four physicians were practicing at Monroe Medical Clinic. Dr. Anders and Dr. Gary Jones, who practiced pediatrics, were on the "pediatrics" emergency room call list, as well as being on the "medicine" unassigned call list at the emergency room. After the departure of these physicians, there were only two doctors practicing at Monroe Medical Clinic (one of whom only worked part time) and they were only on the emergency room medicine list.
The plaintiff testified that after the departure of Dr. Anders and Dr. Gary Jones, he sought to verify that the clinic was not receiving emergency room unassigned calls. Therefore, he sent a part time employee, Sara J. Tucker, to the North Monroe Community Hospital emergency room, on his unassigned call night. The plaintiff contends that even though this call should have been referred to Dr. Henry Jones, Ms. Tucker was referred to either Dr. Gary Jones or Dr. Anders.
Ms. Tucker testified that she went to the emergency room on January 30, 1987 complaining of flu-like symptoms. She was treated and released with instructions to go to her family doctor if she did not improve. She informed personnel at the emergency room that she did not have a family physician. She claimed she was referred to either Dr. Gary Jones or Dr. Anders.
On cross examination, it was determined that in her deposition, Ms. Tucker stated that she told emergency room personnel that she needed a family physician because she had two children who may require treatment. Under these circumstances, Ms. Tucker would not have been referred to Dr. Henry Jones because he did not practice pediatrics.
The emergency room doctors at North Monroe Community Hospital are independent contractors, not employees of the hospital. Dr. Louie Crook, Jr., one such physician, testified as to the procedures used to assign unassigned patients in the emergency room. When a patient without a personal physician is treated and requires admission to the hospital, a physician is assigned. The emergency room selects a physician from the list compiled according to medical specialties, such as family practice, pediatrics, etc. Dr. Crook testified that he personally remembered assigning calls to Dr. Henry Jones. He also stated that if the doctor called happened to not be on call that night, one of the other doctors in the practice would respond for him. Dr. Crook testified that he never told the emergency personnel to deprive Dr. Henry Jones of unassigned emergency room calls.
Dr. Clint Guillory, also an emergency room physician at North Monroe Community Hospital, testified that if a patient required admission to the hospital, the emergency room doctors would call another physician to do so. If the patient did not have a physician, then someone from the unassigned call list was notified. Dr. Guillory testified that no one had ever interfered with the operation of the unassigned call list in the emergency room.
Stella Turbeville, an emergency room nurse at North Monroe Community Hospital, testified that Dr. Henry Jones was on the call list the entire time he was on the staff at the hospital and that Dr. Jones was never skipped on the list. She further testified that she remembered Dr. Henry Jones getting emergency room calls.
The plaintiffs also attempted to show that regular patients of Dr. Henry Jones who went to the emergency room for treatment and asked for him were told that Dr. Henry Jones did not work at the hospital anymore. At trial, in each instance, this testimony was refuted.
Mr. Eron Roberts testified that he went to the North Monroe Community Hospital emergency room in the spring of 1987 and, when he requested Dr. Henry Jones, he was told that Dr. Jones "did not come to that hospital anymore." Hospital records show that on February 28, 1987, Mr. Roberts went to the emergency room with a foreign body in his eye, was treated and released and was referred to an ophthalmologist. The emergency room records also show that Mr. Roberts was treated and released on September 3, 1987 for a cut *788 on his thumb. His instructions were to see Dr. Henry Jones as needed.
Robert Buckley, sheriff of Union Parish, testified that in July, 1986 he went to the North Monroe Community Hospital emergency room on two occasions. Both times he requested Dr. Henry Jones, but was told that Dr. Jones "did not come to the hospital anymore." The hospital records indicate that on July 17, 1986, Sheriff Buckley was admitted to the hospital by Dr. Henry Jones and was treated by him and discharged by Dr. Henry Jones on July 19, 1986. On July 29, 1986, Sheriff Buckley again went to the emergency room. Dr. Henry Jones again admitted Sheriff Buckley.
Ms. Madge Doss testified that in 1986 or 1987, she fell and was worried that her hip prosthesis had been damaged. She was taken to the North Monroe Community Hospital emergency room. Her hip was x-rayed, no problem was noted and she was released. This witness was not clear as to whether she specifically requested that emergency room personnel contact Dr. Henry Jones.
Mr. H.R. Wood testified that in August, 1986 he went to the North Monroe Community Hospital emergency room with a wasp sting. He claimed that he requested Dr. Henry Jones and was told that Dr. Jones did not work at the hospital anymore. He claimed that he was referred to Dr. Gary Jones.
However, emergency room records show that Mr. Wood was treated for this wasp sting on June 1, 1984, while Dr. Henry Jones was still chief of staff at North Monroe Community Hospital and Dr. Gary Jones was not even in medical practice.
Mrs. Lona Wood testified that she had a pinched nerve in her back and was admitted to North Monroe Community Hospital for a myelogram by Dr. Rifat Nawas. She claimed she asked that Dr. Henry Jones be consulted but was told that he did not work at the hospital anymore.
Hospital records show that in October, 1985, Mrs. Wood was admitted to the hospital for a myelogram by Dr. Nawas. The records show that Dr. Henry Jones was consulted concerning her care.
Mr. E.H. Powell testified that on Thanksgiving Day, 1986, he took his wife, Opal, to the North Monroe Community Hospital emergency room with high blood pressure. He claimed he asked that Dr. Henry Jones be notified that his wife was at the emergency room, but that he was told that Dr. Henry Jones "did not come to the hospital anymore." His wife was treated and released.
The emergency room records show that Mrs. Powell reported to the emergency room on November 24, 1988, not in 1986. The records list Dr. Henry Jones as Mrs. Powell's family physician. In instructions given to Mrs. Powell upon her release from the emergency room, she was advised to see Dr. Henry Jones the next week for a follow-up. These instructions were signed by the witness, Mr. E.H. Powell.
Mr. Gordon L. Kindrix testified that Dr. Henry Jones had been his family physician for approximately 10 years. Mr. Kindrix stated that he has ulcers and went to the North Monroe Community Hospital emergency room on a number of occasions with stomach and chest pains. He stated that he asked the emergency room doctor to call Dr. Henry Jones, but was told that Dr. Henry Jones was not on staff.
The emergency room records contradicted the testimony of Mr. Kindrix. These records show that on August 11, 1986, Mr. Kindrix went to the emergency room with stomach pains. Dr. Henry Jones was listed as the patient's family physician and Dr. Henry Jones phoned in orders for Mr. Kindrix.
On February 27, 1987, Mr. Kindrix went to the emergency room complaining of stomach pain. Dr. Henry Jones was listed as his attending physician. The witness was treated and released.
On April 5, 1987, Mr. Kindrix went to the emergency room, again complaining of stomach pain. The records reveal that the emergency room staff noted that Mr. Kindrix had recently seen Dr. Henry Jones for an injection. Mr. Kindrix was treated and *789 released with instructions to see Dr. Henry Jones for a follow-up on Monday.
On April 11, 1989, Mr. Kindrix went to the emergency room complaining of back pain. Emergency room records show that Mr. Kindrix was treated and released with instructions to see Dr. Henry Jones in one to two days.
On June 19, 1990, Mr. Kindrix went to the emergency room complaining that he hit his head while working on a truck and that he had stuck a screwdriver in his hand. Mr. Kindrix was treated and released with instructions to call Dr. Henry Jones as needed. This occurred after Dr. Jones had resigned from the staff of North Monroe Community Hospital.
Mrs. Jo Marie Kindrix, wife of Gordon Kindrix, also testified at trial that she and her son, Brad, went to the emergency room with a virus and that her husband asked that Dr. Henry Jones be called. She testified that the emergency room doctor replied that he would treat the patient that night and that they could go to see Dr. Henry Jones the next day.
The emergency room records show that this incident took place on August 1, 1984, while Dr. Henry Jones was the chief of staff of North Monroe Community Hospital.
Although the witnesses discussed above reported to the emergency room and claimed that they were denied access to Dr. Henry Jones, the certified hospital records from the emergency room refute their testimony and show that, in each case, proper procedures were followed. If Dr. Henry Jones was not called at the time the patient was in the emergency room, the patients were informed to report to Dr. Henry Jones within a few days or as needed. These records show that the defendants did not act to interfere with the treatment of patients by Dr. Henry Jones nor did the defendants seek to divert those patients to other doctors.
The documentary evidence so contradicts the testimony of the above named witnesses that a reasonable fact finder could not credit that testimony. Therefore, according to the standards set forth in Rosell v. ESCO, supra, any finding by the jury based upon the testimony of these witnesses is manifestly erroneous and clearly wrong.
At trial, the plaintiff did not attack the accuracy or validity of the hospital records which were filed into evidence. These records are complete and obviously accurate. The plaintiff offered no evidence to show that the records were forged or tampered with in any way. I also observe that there is no reason why the jury would assign credibility to testimony that the emergency room staff refused to call Dr. Henry Jones at a time when Dr. Jones was chief of staff of the same hospital.
Based upon these factors, the plaintiff failed to prove that the defendants denied the plaintiff unassigned emergency room calls or refused to call Dr. Henry Jones when his regular patients reported to the emergency room.

Credibility Determinations By The Jury
The majority opinion summarizes testimony relating to Dr. Henry Jones, bearing on alleged ill will by the defendants toward the plaintiff. The majority states that the jury was presented with two versions of the relevant facts and reasonable inferences concerning the intent of the defendants, either of which the jury could have believed. However, as demonstrated above, matters that the majority contends could have been believed by the jury in arriving at a determination that the defendants had ill will against the plaintiff were irrefutably shown to be false.

CONCLUSION
The evidence in the record, when weighed according to the applicable legal standards, fails to establish that the defendants engaged in unfair trade practices against the plaintiff, Monroe Medical Clinic. Therefore, the jury verdict in favor of the plaintiff is manifestly erroneous and clearly wrong. I would reverse the trial *790 court judgment and enter judgment in favor of the defendants.
I respectfully dissent.
NOTES
[1] Because of the lack of formalities necessary to immovable property contracts, Dr. Jones's offer to purchase Lot One was never accepted by HCA, rendering the alleged "agreement" legally unenforceable, notwithstanding Dr. Jones's lawsuit seeking enforcement. See Jones v. Hospital Corp. of America, 516 So.2d 1175 (La.App. 2d Cir.1987).

By motion in limine in this action, defendants sought to exclude evidence of the transaction concerning Lot One, arguing that plaintiff's claim on that basis was barred by res judicata because Dr. Jones's prior action concerning Lot One was dismissed. The trial court denied the motion, finding that the thing demanded in the two suits was different (recognition of ownership interest in land v. damages for unfair trade practices). Defendants did not seek supervisory review of that ruling or assign it as error on appeal.